## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH DAKOTA

---

| | |
|---|---|
| IN RE CONTEMPT SANCTIONS AGAINST JOHN KILGALLON, Chief of Staff for the United States Marshals Service, DANIEL C. MOSTELLER, United States Marshal for the District of South Dakota, and STEPHEN HOUGHTALING, Chief Deputy United States Marshal for the District of South Dakota, individually and in their official capacities.<br><br>Defendants. | Case No. 21-MC-01 |

---

## OFFICIAL CAPACITY DEFENDANTS' AND INDIVIDUAL CAPACITY DEFENDANTS' RESPONSE TO THE COURT'S SHOW CAUSE ORDER

The United States, on behalf of John Kilgallon, chief of staff for the United States Marshals Service, Daniel C. Mosteller, United States Marshal for the District of South Dakota, and Stephen Houghtaling, Chief Deputy United States Marshal for the District of South Dakota, each in their official capacities (collectively, "Marshals Service"), respectfully provides this response to the Court's May 19, 2021 show cause order ("Order"). Defendants John Kilgallon, Daniel C. Mosteller, and Stephen Houghtaling (collectively, "Individual Defendants"), also respond to the Court's Order to the extent it proposes holding them in contempt in their personal capacity.

## INTRODUCTION

The Defendants share the Court's concern that public safety in the United States Courthouse is paramount, and that all reasonable steps should be taken to ensure a safe environment for all persons who either work in or

1

otherwise attend court proceedings. The Marshals Service and the Individual Defendants take these solemn obligations especially seriously.[1] The Marshals Service, like the judiciary and many other employers, has been working diligently to develop policies and practices that best promote public health and safety in a dynamic and unprecedented environment. As "[i]t is the primary role and mission of the United States Marshals Service to provide for the security and to obey, execute, and enforce all orders of the United States District Court . . . as provided by law," 28 U.S.C. § 566(a), the Marshals Service is committed to working collaboratively to develop policies and procedures that take into account judicial and courtroom security, safety, and the needs of the Marshals Service workforce. Indeed, Congress has expressly required the Director of the Marshals Service to

> consult with the Judicial Conference of the United States on a continuing basis regarding the security requirements for the judicial branch of the United States Government, to ensure that the views of the Judicial Conference regarding the security requirements for the judicial branch of the Federal Government are taken into account when determining staffing levels, setting priorities for programs regarding judicial security, and allocating judicial security resources.

28 U.S.C. § 566(i). "The United States Marshals Service retains final authority regarding security requirements for the judicial branch of the Federal Government." *Id.*

The Marshals Service and the Individual Defendants are deeply troubled by any suggestion that the Marshals Service employees violated an order of this

---

[1] Marshal Mosteller, Chief Deputy Houghtaling, and Mr. Kilgallon collectively have over 75 years of public service.

Court or otherwise disrupted court proceedings. The issues raised in the Court's Order are of critical importance and certainly are worthy of continued collaboration and consideration. In response to the Court's Order, the Marshals Service and its officials submit that neither the agency nor its employees have engaged in contemptuous conduct for the reasons discussed below.

## SUMMARY OF ARGUMENT

A contempt finding in either Defendants' official or individual capacities is unwarranted for several reasons. First, the Court's show cause order does not identify with sufficient specificity the "previous orders for hearings" Defendants allegedly violated. If the Court is referring to its orders scheduling certain criminal proceedings, the Marshals Service is not directly subject to those orders, although it ensures that criminal defendants are made available on the dates identified by the Court in those orders. And no other order of the Court clearly commanded the Marshals Service to produce criminal defendants in court without regard to the agency's independent responsibility to ensure the security of the Court and its proceedings.

Second, the evidence will show that the Marshals Service did not temporarily remove the criminal defendants from the courthouse to obstruct the administration of justice or retaliate against the Court for its decisions on how to conduct its proceedings. Rather, the Defendants acted in compliance with their statutory mandate to ensure the physical safety and security of individuals in a federal courtroom, specifically the Court, its personnel, litigants, and members of the public. Moreover, they acted in good faith when

faced with an unprecedented, urgent situation—the forced removal of its deputies while a dangerous criminal defendant remained in the courtroom. At that point, the Marshals Service could no longer ensure the safety of the courtroom consistent with its statutory obligations and its policy. Marshals Service policy mandates that at least one deputy marshal must be present to provide judicial and courtroom security whenever an in-custody person is physically present in the courtroom, regardless of the presence of district security officers or court security officers. That policy also is reflected in its court security officer contract. Accordingly, Defendants made the good faith determination that they had to temporarily remove the criminal defendants from the courthouse to comply with their statutory obligations and policy. In addition, the Defendants took remedial action soon after the issues arose to substantially comply with the Court's scheduling order to ensure that the criminal defendants were produced and their hearings could go forward with as little disruption to the Court's schedule as possible. The Defendants offer their sincerest regrets for the delays in communication that may have impacted the Court's operation. All are committed to better communication with the Court and will continue to do so in an effort to facilitate dialogue on the issues the Court identifies in its Order to Show Cause. Accordingly, no injunction is warranted.

For these reasons, contempt is unwarranted. The Marshals Service endeavored in good faith to comply with its statutory responsibility and policy directive regarding judicial and court security, as well as its court security

officer contract, and it promptly took remedial action to resume court proceedings as quickly as possible. None of the purposes of civil contempt would be served by an order designed to coerce the Defendants into compliance in these circumstances.

## BACKGROUND

On March 25, 2021, the Court issued a memorandum to those employed at the United States Courthouse in Aberdeen, South Dakota noting that it intended to ask those employed at the courthouse about their vaccination status. *See* Order, Ex. A, ECF No. 1-1. The Court stated that it wanted to know whether those employed at the courthouse had been vaccinated so that it "can decide what further action is required" on its part. *Id.* The Court noted that it "expect[ed] each person to reply in writing to this memo and promptly." *Id.* Although this memorandum was not directed to the Marshals Service, on April 13, 2021, the Court's judicial assistant informed the Court that she had not received any response from the Marshals Service, and the Court asked her to tell the Marshals Service that it was waiting on a response. *See* Ex. 1.

Accordingly, on April 15, 2021, Marshal Mosteller responded to the Court's March 25, 2021 memorandum. Marshal Mosteller explained that "this pandemic has required all of us to navigate some uncharted territory," and that he was seeking advice from the Marshals Service's Office of General Counsel on "the steps we should take to ensure the safety of our personnel, along with their rights/wishes, while still completing our mission to the courts." *See* Order, Ex. B, ECF No. 1-2. Marshal Mosteller explained that the Marshals

5

Service's Judicial Security Division and its executive leadership were working with the Administrative Office of the United States Courts to develop guidance with respect to vaccinations at the national level. *Id.* Marshal Mosteller noted that because vaccinations were provided to Marshals Service employees under an Emergency Use Authorization, the Marshals Service was not requiring employees to be vaccinated at that time. *Id.* Marshal Mosteller also stated that additional issues caused him concern, including that delving into the reasons for not being vaccinated "encroach[es] on EEO statutes when it concerns medical information, disabilities, and religious beliefs." *Id.* For those reasons, Marshal Mosteller explained, Marshals Service employees would "not be providing their respective vaccination status to the Court" at that time. *Id.* The Defendants are prepared to offer evidence at the June 14 hearing showing that Marshal Mosteller deferred to individual employees to make their own decision regarding the disclosure of their vaccination status. Marshal Mosteller neither instructed nor encouraged employees not to provide their vaccination status to the Court.

On May 4, 2021, Chief Judge Lange responded to Marshal Mosteller's letter in a letter addressed to Marshals Service Chief of Staff John Kilgallon stating that he was writing "on behalf of the judges of the District of South Dakota" regarding an issue the Court had with the COVID-19 vaccination status of the Deputy U.S. Marshals in the District. Order, Ex. E, ECF No. 1-5. Chief Judge Lange stated, among other things, that "this Court likely will debar from chambers and courtrooms all its employees who refuse to be vaccinated."

*Id.* Chief Judge Lange further explained that the district judges in South Dakota want to avoid having unvaccinated deputy marshals in the courtroom and inquired as to whether Marshals Service policy was to not know the vaccine status of deputy marshals. *Id.* Chief Judge Lange further inquired whether the Marshals Service intended to have unvaccinated deputies work inside courtrooms where judges require all to be vaccinated. *Id.*

On May 10, 2021, before any scheduled hearings, Marshals Service Chief of Staff Kilgallon responded to Chief Judge Lange's letter. Order, Ex. F, ECF No. 1-6. Mr. Kilgallon noted that the Marshals Service "shares the Court's concerns regarding COVID-19 and has been steadfast in its efforts to comply with the Centers for Disease Control and Prevention (CDC) guidance to mitigate the risks associated with transmission of the virus, to include mask wearing, maintaining social distance, donning needed personal protective equipment, and diligent hand hygiene." *Id.* Mr. Kilgallon explained that the Marshals Service currently is facing critical staffing shortages for deputy marshals—it is at 69% and 65% of required staffing levels nationally and in South Dakota, respectively—which contributed to the limited number of trials, hearings, and pre- and post-trial appearances that can be supported by the Marshals Service simultaneously. *Id.* Accordingly, Mr. Kilgallon observed that any widespread court order or other restriction that would impose limitations on deputy marshals "further degrades our nationwide ability to support the judiciary and may negatively impact the ability of courts to conduct their business when such security is required." *Id.*

Mr. Kilgallon explained that while the Marshals Service shared Chief Judge Lange's goal that everyone in the courtroom be vaccinated, he noted the likelihood of that occurring was improbable for the foreseeable future, particularly given the absence of any legal authority to mandate vaccinations for detainees, U.S. Attorneys, defendants, jurors, defense counsel, witnesses, deputy marshals, court security officers, guards, other federal agents, or other participants in criminal or civil matters. *Id.*

Mr. Kilgallon noted that the Marshals Service continued to operate under security protocols established based upon CDC guidance, and presumed that individuals would be permitted to appear in person with the requirement that they comply with CDC and health authority requirements to mitigate the transmission of the virus. *Id.* Mr. Kilgallon further assured Chief Judge Lange that, regardless of vaccine status, deputy marshals would take all necessary precautions to mitigate the risk of transmission by wearing face masks, ensuring social distance while still being mindful of their security mission when assigned to a courtroom proceeding, wearing other personal protective equipment as needed, and practicing diligent hand hygiene. *Id.* [2]

For all of these reasons, Mr. Kilgallon explained, the Marshals Service strongly encourages but does not mandate that deputy marshals be vaccinated. *Id.* Mr. Kilgallon noted that Marshals Service policy was consistent with that of other federal employers, which also do not mandate vaccinations,

---

[2] In addition, Mr. Kilgallon explained that although the Marshals Service has taken steps to encourage or offer vaccinations to detainees in its custody, fewer than 15 percent of detainees had been confirmed as vaccinated. *Id.*

as well as guidance from the Administrative Office of the U.S. Courts, which cautioned that "any adverse action for violating a vaccine mandate, directive or policy is implicitly an unauthorized and impermissible mandate." *Id.*

Mr. Kilgallon explained that based on anonymous submissions to the agency, approximately 52% of deputy marshals nationwide are fully vaccinated, while the number in South Dakota was approximately 44%. *Id.* He further explained that there are a number of reasons why deputy marshals and detainees may decide not to be vaccinated, including fears of unknown side effects and long-term adverse effects, incomplete scientific information and evaluation regarding efficacy related to evolving variant strains, fears concerning present and future pregnancy, religious objections, and concerns that the vaccine could negatively affect existing health conditions or disabilities. *Id.* Additional reasons why individuals might decline the vaccine include the conclusion by some that it was not necessary due to age or other environmental conditions, or other rational or irrational beliefs regarding the vaccine. *Id.*

Finally, Mr. Kilgallon explained that the Marshals Service is not requiring that its employees divulge their vaccination status to their management, and is "not inclined to direct [Marshals Service] personnel to provide this information to the court or any other third party." *Id.* He emphasized, however, that the Marshals Service "intend[s] to continue to support the judiciary and perform our court security responsibilities with the professionalism and diligence that

we have always demonstrated," including having deputy marshals abide by current CDC protocols when operating in the courtroom. *Id.*

The Court held criminal proceedings on May 10, 2021. During the first proceeding that day, the Court asked the deputy marshal in attendance whether she had been vaccinated, and the following colloquy took place:

> THE COURT:  And you have been fully vaccinated, ma'am?
>
> DUSM KINNEY:  Me?
>
> THE COURT:  Yes.
>
> DUSM KINNEY:  Sir, I respectfully decline to answer that.
>
> THE COURT:  All right.  You may leave the courtroom immediately.
>
> DUSM KINNEY:  Okay, sir, I'll have to take him with me then.
>
> THE COURT:  No, you won't.  I told the Marshal what to do on that and you should follow those orders.
>
> DUSM KINNEY:  Go back and tell Kolb, please.  May we have - -
>
> THE COURT:  Don't come in this courtroom again unless you're fully vaccinated.  Do you understand that?
>
> DUSM KINNEY:  Yes, sir.
>
> THE COURT:  All right.  You may leave.  Leave the Defendant where he is.
>
> DUSM KINNEY:  Judge, I can't leave him alone.

10

THE COURT:  Yes, you're going to do exactly what I tell you

to do or you will be in custody yourself.  If you don't have a

marshal here that's fully vaccinated, that's your problem, not

mine.  You may leave, ma'am.

DUSM KINNEY:  Judge, I can't leave a prisoner in here.

THE COURT:  Yes, you will.  I'm going to give you 10 seconds

to leave this courtroom.

Ex. 2 (Transcript of Supervised Release Revocation Sentencing Hearing in

*United States v. White Tail,* No. 1:11-CR-10022-CBK (May 10, 2021)), at 3:12-4-

13.[3]

The Defendants are prepared to offer evidence at the June 14 hearing

that will show that after exiting, a deputy marshal stood on alert outside of the

courtroom door to ensure the safety of those who remained inside while also

communicating the situation to Chief Deputy Houghtaling.

Because Marshals Service policy requires that at least one deputy be

present to provide judicial and courtroom security whenever an in-custody

person is physically present in the courtroom, regardless of the presence of

district security officers or court security officers, *see* Ex. 3 (Policy Directives

---

[3] The absence of a deputy marshal in the courtroom during the first hearing was
of particular concern given that this was a homicide case and, as acknowledged
by both defense counsel and the Court, the defendant was dangerous. Tr. 19:11-
13 (noting that this was a homicide case where the defendant was convicted of
manslaughter for killing his brother); Tr. 21:18-20 (defense counsel
acknowledging "[s]o the question here isn't whether he's not a danger.  He clearly
has been and he clearly will be unless he gets the kind of treatment that he needs
and we've got that now."); *Id.* at 24:16-21 (the Court agreeing that "this
Defendant is a very dangerous individual").

10.2(D)(4)(a)-(b)), the Marshals Service made the decision to temporarily remove all criminal defendants in Marshal custody from the courthouse and transport them to the nearest appropriate jail facility.

Marshal Mosteller is prepared to testify to the safety, security, and logistical reasons that left the Marshals Service little choice but to temporarily remove the criminal defendants from the courthouse. The evidence will show the circumstances were unprecedented, and this difficult decision was made by the Marshals Service's executive staff in consultation and deliberation with the District. It also required considerable coordination with deputy marshals, who communicated with the local deputies transporting the prisoners.

The Defendants are also prepared to offer evidence that will show that the Court was on the bench when the decision was made, and Marshal Mosteller instructed Chief Deputy Marshal Houghtaling to inform the Court of the movement of prisoners when security, safety and logistical circumstances made it feasible. Shortly after 2 p.m., Chief Deputy Marshal Houghtaling called chambers, but at 2:12 p.m., he was informed by the Court's judicial assistant, Ms. Barbara Paepke, that the Court was still on the bench. Order, Ex. C, ECF No. 1-3. Evidence will show that Chief Deputy Marshal Houghtaling advised Ms. Paepke at that time that the call was very important. About 15 minutes later, Chief Deputy Houghtaling spoke to the Court and explained that once the deputy marshal was excluded from the courtroom, the Marshals Service could

not safely provide the level of security to proceed with court proceedings.[4] Order, Ex D at Tr. 4:3-9, ECF No. 1-4. Chief Deputy Marshal Houghtaling further explained that Marshals Service policy required a deputy marshal in the courtroom when an in-custody defendant was present. *Id.*

Ultimately, Systems Administrator Skyler Gallimore with the U.S. District Court proposed a "workable solution" agreed upon by the Court, the U.S. Attorney's Office, and defense counsel, where the criminal defendants appeared via video conferencing in a third floor room of the courthouse with the deputy marshal present. *Id.* at Tr. 14:20-15:2. The Defendants are prepared to offer testimonial and documentary evidence that will show the efforts made by Marshal Mosteller and Marshals Service staff to facilitate the prisoners' expeditious return to the federal courthouse. The Court's records will show that all afternoon proceedings went forward, with a maximum time span of approximately 39 minutes between hearings, all which were concluded at approximately 4:34 pm. Ex. 6.

On May 19, 2021, the Court issued an order requiring Messrs. Kilgallon, Mosteller, and Houghtaling "to appear personally before this Court and show cause, if any there be, why they should not be found to be in civil contempt of this Court, with possible monetary sanctions if found to be in contempt." Order

---

[4] The evidence will show that the in-custody defendants scheduled for hearing on May 10 had violent criminal histories, including felony convictions for murder. A Courtroom Security Officer (CSO) and District Security Officer (DSO), not academy-trained deputy U.S. marshals, were the only security personnel remaining in the courtroom after the court ordered the deputy marshal to leave the courtroom.

at 10. Specifically, the Court concluded that "[t]he Marshals Service thus directly violated previous orders for hearings and the rights of the defendants, their attorneys, the AUSA's court personnel, and the Court itself," when the Marshals Service removed criminal defendants from the courthouse after the deputy marshal was ordered out of the courtroom. *Id.* at 5.

On May 21, 2021, Chief Judge Lange issued standing order 21-6. That order, among other things, provided that masks would be required in common areas of the courthouse only for those who have not been vaccinated, and that those who have not been vaccinated—including Deputy US Marshals, among others—must wear masks in all common areas, including within the courtroom. *See* Standing Order 21-6. The standing order noted that due to the fluid nature of the pandemic and the need for flexibility in responding, individual judges may determine whether different standards should apply for a particular court proceeding. *Id.*

On May 25, 2021, the Court issued standing order 21-7. That standing order supplemented Chief Judge Lange's standing order 21-6 and provided that persons who had not been fully vaccinated or "as to whom we do not know the fully vaccinated status" shall at all times inside the courthouse wear an N-95 mask or a double mask. *See* Standing Order 21-7. The standing order further provides that all persons who have not been fully vaccinated or whose vaccination status is unknown "shall also at all times within the courthouse maintain social distancing of not less than six feet from all other persons," and that those individuals "shall not enter into the chambers of the court, library

rooms, office of the magistrate, office of the judicial assistant, office of the law clerks, the bathroom adjacent to the copy room, the 4th floor jury room, or the copy room." *Id.*

## LEGAL STANDARDS

"[I]t is firmly established that the power to punish for contempt is inherent in all courts." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (internal punctuation and citation omitted). Principles of "basic fairness requir[e] that those enjoined receive explicit notice" of "'what conduct is outlawed'" before being held in civil contempt." *Taggart v. Lorenzen,* 139 S. Ct. 1795, 1802 (2019) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam)). "A contempt order must be based on a party's failure to comply with a 'clear and specific' underlying order." *Chaganti & Assocs., P.C. v. Nowonty*, 470 F.3d 1215, 1223 (8th Cir. 2006); *see also Imageware, Inc. v. U.S. W. Commc'ns.* 219 F.3d 793, 797 (8th Cir. 2000) ("No one should be held in contempt for violating an ambiguous order."). As the Eighth Circuit has explained, "[c]ivil contempt is available only where a court order exists and it can be enforced." *Russell v. Sullivan*, 887 F.2d 170, 171 (8th Cir. 1989) (per curiam) (holding that contempt sanction was unavailable where there was no order directing cabinet Secretary to pay fees).

Moreover, civil contempt is an objective standard. *Taggart*, 139 S. Ct. at 1802. As a result, "[c]ivil contempt may be appropriate if there is no objectively reasonable basis for concluding that the [party's] conduct might be lawful." *Id.* at 1799. But civil contempt "should not be resorted to where there is [a] fair

ground of doubt as to the wrongfulness of the defendant's conduct." *Id.* at 1801.

Once the initial burden of showing civil contempt is met, the burden then shifts to the alleged contemnor to show that it should not be held in civil contempt based on an inability to comply. *Chi. Truck Drivers v. Bhd. Of Labor Leasing*, 207 F.3d 500, 505 (8th Cir. 2000). To show that compliance presently is impossible, the contemnor must demonstrate: "(1) that they were unable to comply, explaining why categorically and in detail, (2) that their inability to comply was not self-induced, and (3) that they made in good faith all reasonable efforts to comply." *Id.* at 506 (citations omitted). A civil contempt finding requires clear and convincing evidence. *Id.* at 504.

"The contempt power is a most potent weapon, and therefore it must be carefully and precisely employed." *Mahers v. Hedgepeth*, 32 F.3d 1273, 1275 (8th Cir. 1994); *Chambers*, 501 U.S. at 44 ("Because of their very potency, inherent powers must be exercised with restraint and discretion."). Accordingly, a court imposing civil contempt "must exercise '[t]he least possible power adequate to the end proposed.'" *Shillitani v. United States*, 384 U.S. 364, 371 (1966) (alteration in original). Moreover, "a compensatory sanction is not imposed to vindicate the court's authority or to punish the contemnor, but rather serves to make reparation to the injured party, restoring that party to the position it would have held had the court's order been obeyed." *Hartman v. Lyng*, 884 F.2d 1103, 1106 (8th Cir. 1989). An overarching goal of a court's contempt power is "to ensure that litigants do not anoint themselves with the

power to adjudge the validity of orders to which they are subject." *Chi. Truck Drivers*, 207 F.3d at 504.

In addition, as the Eighth Circuit has explained, the United States has not waived its sovereign immunity with respect to civil contempt for monetary sanctions. *Coleman v. Espy*, 986 F.2d 1184, 1191 (8th Cir. 1993). If the court concludes that a civil contempt coercive fine is appropriate, an opportunity to reduce or avoid the fine through compliance must be given. *Int'l Union, United Mine Workers of Am.* v. *Bagwell,* 512 U.S. 821, 829 (1994) (discussing the difference between civil and criminal contempt fines).

As discussed below, the Defendants made efforts to substantially comply with this Court's orders and have not willfully violated an order so as to justify the entry of a civil contempt order or sanctions.

## DISCUSSION

## I.    Actions Taken Pursuant to Marshals Service Policies Do Not Warrant a Finding of Civil Contempt.

The Order suggests that the Marshals Service "directly violated previous orders for hearings and the rights of the defendants, their attorneys, the AUSA's, court personnel, and the Court itself," when the Marshals Service removed criminal defendants from the courthouse. Order at 5. The Order also suggests that "[f]ollowing my sanction of requiring a Deputy U.S. Marshal to leave the courtroom for violating my order, the U.S. Marshals Service and defendants retaliated by 'kidnaping' criminal defendants who had been ordered

17

to appear before me." *Id.* at 8.[5] Defendants respectfully submit that the Order does not provide any basis for holding them in contempt.

As an initial matter, the Court's show cause order does not identify with sufficient specificity the "previous orders for hearings" Defendants allegedly violated, and for that reason alone contempt is unwarranted.[6] Nevertheless, as explained below, although the Marshals Service acknowledges it could have done a better job communicating with the Court about how to reconcile the Court's directives and the Marshals Service's statutory obligations and policies,

---

[5] To the extent the Court viewed other actions of the Marshals Service as potentially constituting contempt, the government respectfully suggests that the Order is insufficiently specific as to reasonably put the Marshals Service or Marshal Mosteller, Chief Deputy Marshal Houghtaling, or Mr. Kilgallon on notice.

[6] To the extent the Court is referring to its orders scheduling certain criminal proceedings, the Marshals Service is not directly subject to those orders, although it ensures that criminal defendants are made available on the dates identified by the Court in those orders. And no other order of the Court clearly commanded the Marshals Service to produce criminal defendants in court without regard to the Service's own responsibility to ensure the security of the Court and its proceedings. To take an example, the writ of habeas corpus ad prosequendum entered in *United States v. Smith*, No. 1:20-cr-10024-CSK (Aug. 13, 2020) (Dkt. 4, Page ID #10), one of the cases scheduled for hearing on May 10, commanded the Marshals Service to bring that defendant before the Court "for any other matters necessary for the proper disposition of the charges now pending against him in this Court." But the writ qualified that the criminal defendant be brought to court "under safe and secure conduct." And in that respect it acknowledged the authority of, and necessity for, the Marshals Service to make judgments regarding how to secure the Court and its proceedings. *Cf.* 28 U.S.C. § 566(i) ("The United States Marshals Service retains final authority regarding security requirements for the judicial branch of the Federal Government."). Relatedly, the Defendants' objective, good faith belief in their statutory mandate to make security judgments is relevant to this Court's consideration of contempt. *Taggart*, 139 S. Ct. at 1801-02. Accordingly, it would be inappropriate to hold the Marshals Service and its officials in contempt based upon an alleged violation of orders issued in the May 10 or 11 criminal proceedings.

the actions taken by the Marshals Service do not warrant a finding of contempt. The Marshals Service takes seriously its responsibility "to provide for the security and to obey, execute, and enforce all orders" of the Court. 28 U.S.C. § 566(a). And under no circumstances would the Marshals Service or its officials retaliate against the Court for its orders or decisions on how to conduct its proceedings. The Marshals Service and its officials sincerely regret any impression along those lines resulting from the events described in the Order.

The Marshals Service temporarily removed the criminal defendants from the courthouse after the Court ordered the deputy marshal out of the courtroom because, at that point, the agency could not ensure the safety and security of the courthouse consistent with its statutory obligations under 28 U.S.C. § 566(a) and 566(i) and its policy. Pursuant to Marshals Service policy, at least one deputy marshal must be present to provide judicial and courtroom security whenever an in-custody person is physically present in the courtroom, regardless of the presence of district security officers or court security officers. *See* Ex. 3 (Policy Directives 10.2(D)(4)(a)-(b). That policy also is reflected in the Marshals Service's court security officer contract with the Eighth Circuit, which precludes court security officers from moving or monitoring Marshals Service prisoners. *See* Ex. 5 (Section C.3.1.2, which provides that "CSOs shall not monitor cellblocks or handle and escort prisoners"); (Section C.14.2.26, explaining that a "dereliction of duty" includes the movement or monitoring of USMS prisoners); (Section H.13(c), stating that "[t]he Contractor shall ensure

19

that its employees are made aware that they should not be handling prisoners or accessing cellblock areas on a routine basis as this is not a requirement of the contract and puts the employees at a high risk of infection.").

Accordingly, to ensure the safety and security of the courthouse, and to comply with its statutory obligations and policy directive, the Marshals Service temporarily removed the criminal defendants from the courthouse. To be sure, the Marshals Service acknowledges it could have done better in communicating to the Court the reasons for its actions, and the agency and its officials sincerely regret the impact on court proceedings described in the Order. But the Marshals Service did not temporarily remove criminal defendants from the courthouse in an attempt to flout any order of the Court or to frustrate court proceedings, and certainly not to retaliate against the Court; rather, the agency was endeavoring in good faith to comply with its statutory responsibility and policy directive regarding judicial and court security, as well as its court security officer contract. Under these circumstances, contempt sanctions are not warranted.[7]

---

[7] To the extent the Court's show cause order contemplates a monetary sanction against the three individual Marshals Service employees in their official capacity, such a remedy is barred by sovereign immunity. *See Coleman*, 986 F.2d at 1191. Sovereign immunity does not shield Marshal Mosteller, Chief Deputy Marshal Houghtaling, and Mr. Kilgallon from monetary sanctions in their individual capacities, however. *See Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017) (explaining the distinction between official- and individual-capacity suits); *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). But for the reasons explained here and in Part II, a personal monetary sanction against these three individuals would not be an appropriate response to the concerns raised in the order to show cause.

We recognize that the Court has substantial concerns about certain Marshals Service policies relating to vaccinations. Marshals Service policy, like that of other federal agencies,[8] is that it strongly encourages its employees to be vaccinated, but that it does not mandate it. Order, Ex. F. Marshals Service policy also provides that it will not require employees to disclose their vaccination status to either the agency or to third parties, including courts, although employees are certainly free to do so voluntarily. *Id.* Nevertheless, the Marshals Service has taken substantial steps to ensure that courtroom proceedings are conducted safely, including compliance with all CDC guidance, including wearing masks when recommended in certain settings, engaging in social distancing where possible, while ensuring the safety of the courthouse, wearing other protective equipment, as needed, and engaging in good hand hygiene. *Id.*

---

[8] The Marshals Service, as a component of the Department of Justice ("DOJ"), is required to follow the guidance promulgated by DOJ's Justice Management Division ("JMD"). JMD's guidance provides, among other things, that those who are not fully vaccinated must continue to wear a mask, and notes that "supervisors and managers should not ask about an employee's vaccination status or use information about an employee's vaccination status to make decisions about how and when employees will report to a workplace instead of teleworking." Ex. 4. JMD's guidance is consistent with that of other federal agencies, such as the Department of Defense. *See* https://www.fedweek.com/fedweek/dod-employees-generally-may-not-be-asked-about-vaccination-status/ (last visited June 3, 2021). While the Marshals Service understands that the Court may disagree with this guidance, it assures the Court that it was promulgated in good faith after significant deliberation. In addition, contrary to the Court's suggestion, Order at 7, the Marshals Service is neither instructing nor encouraging deputy marshals to refuse to answer vaccination questions posed by members of the judiciary.

The agency is committed to working with the judiciary, including this Court, to try and accommodate the Court's concerns as best it can. Defendants respectfully suggest, however, that working through these complicated policy issues would best be achieved through dialogue, rather than through a finding of contempt. Accordingly, Defendants emphasize that they are willing to work with this Court, as well as the other judges in the District, to develop policies and practices that promote the safety and security of the courthouse and judicial proceedings, while appropriately balancing other interests and considerations.

## II.   The Individual Defendants' Official Capacity Acts Do Not Warrant a Finding of Civil Contempt in Their Personal Capacities.

Civil contempt is a "severe remedy," *Taggart*, 139 S. Ct. at 1802 (quoting *California Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)). For the reasons discussed above, civil contempt is not warranted against the Marshals Service itself. And these same reasons apply with even greater force to Marshal Mosteller, Chief Deputy Marshal Houghtaling, and Mr. Kilgallon in their individual capacities. They all acted in a good faith effort to follow and implement their agency employer's policy directives on the one hand, while responding to the Court's calendar schedule on the other. As suggested above, to the extent the Court's concerns appear rooted in agency policy, the problem is better addressed through direct dialogue, rather than holding individual agency employees in contempt in their personal capacity. In this context, personal monetary sanctions seem especially unwarranted, where the

individual officials at all times sought to ensure the safety and security of the judiciary and the courthouse, as best they could. A finding of contempt or sanctions against Marshal Mosteller, Chief Deputy Marshal Houghtaling, and Mr. Kilgallon personally is inconsistent with the remedial purposes of civil contempt. These officials are charged with ensuring the continued security of the Court while also complying with their own agency's policies. Holding them in contempt for their efforts to discharge those responsibilities here would be inconsistent with the jurisprudential principles of fairness, restraint, and discretion that inform the Court's exercise of its inherent powers. *See supra* at p. 14.

Marshal Mosteller, Chief Deputy Marshal Houghtaling, and Mr. Kilgallon proceeded from a reasonable, good faith belief that their actions were lawfully in furtherance of the Marshals Service's statutory mandate to ensure the Court's security. *See Taggart*, 139 S. Ct. at 1799; *see also* 28 U.S.C. §§ 566(a); 556(i). That statutory mandate and the Marshals Service policies and procedures under which these officials must operate posed a dilemma for these officials. Their Executive Branch employer and the Court required different things at that moment. In response, they facilitated the Marshals Service's attempt at substantial compliance with the Court's scheduling orders by ensuring the prisoners prompt transport back to the federal courthouse and the deputy marshals' security presence at videoconferencing. *Chi. Truck Drivers*, 207 F.3d at 506. That good faith, and basic equitable considerations, warrant no finding of civil contempt or personal sanctions.

## A. The Individual Defendants Acted in a Good Faith Effort to Discharge Official Duties.

Marshal Mosteller, Chief Deputy Marshal Houghtaling, and Mr. Kilgallon acted in the objective, good faith belief that their actions were in furtherance of the Marshals Service's statutory duty to provide for the court's security and the agency's policies concerning the safety and security of prisoners in the courtroom. *See supra* at pp. 9-10, 17 (discussing U.S. Marshals Service Policy Directives); *see also* 28 U.S.C. §§ 566(a); 556(i). They did not act with improper purpose or motive to violate any order, nor did they act to retaliate against the Court. Given their good faith and reasonable understanding of the scheduling orders at issue and "the statutes that govern [the] scope" of their conduct, the Court should not find that civil contempt is appropriate. *Taggart*, 139 S. Ct. at 1802.

As described in detail above, the officials charged with the responsibility of producing prisoners were unable to fully comply with the time-frame outlined in the Court's scheduling order due to the immediate security issue confronting the Marshals Service. In order to ensure the requisite level of security when prisoners were present, Marshals Service policy required a deputy marshal in the courtroom. The presence of a Courtroom Security Officer or District Security Officer does not meet these security protocols. This therefore required the temporary removal of prisoners. Even with adequate

staffing of deputy marshals in court, prisoners can pose a security threat to the judge, other court personnel, and themselves.[9]

As soon as the prisoner was left in the courtroom with only a CSO and a DSO, the Marshals Service took immediate steps to ensure the safety of the judiciary at the conclusion of the hearing. A Deputy remained just outside the door out of concern for court personnel until the conclusion of the hearing. A decision to secure the in-custody criminal defendants was expeditiously made by the District in consultation with Marshals Service headquarters. Chief Deputy Marshal Houghtaling took steps to call the Court regarding the movement of the prisoners, but the Court was on the bench. The Individual Defendants' compliance with their statutory mandate and the Marshals Service's policies unfortunately had an unavoidable impact on the Court's scheduling orders. *Chi. Truck Drivers*, 207 F.3d at 505. But as explained, the Individual Defendants also took reasonable steps to facilitate substantial compliance with Court's ordered hearings. *Id.* at 506.

---

[9] *See e.g. Angilau v. United States*, No. 2:16–CV–00992, 2018 WL 1278393 at *7 (D. Utah. Mar. 9, 2018) (qualified immunity granted to Deputy United States Marshal who was forced to use deadly force against an unshackled inmate who attacked a witness near the judge in a federal courtroom, given the security threat he posed to the judge, the jury, the witness, court reporter and others); *see also* https://www.twincities.com/2021/05/17/defendant-fatally-cuts-own-throat-after-guilty-verdict-in-fargos-u-s-courthouse/ (last accessed June 3, 2021).

**B. The Individual Defendants Took Substantial, Good Faith Steps to Comply with the Court's Scheduling Order and a Personal-Capacity Contempt Finding is Not Warranted.**

In determining whether public officials have violated an order, "the court must always be mindful of the [order's] purpose," *Mercer v. Mitchell,* 908 F.2d 763, 770 (11th Cir. 1990), and substantial, good faith compliance is a defense to an action for civil contempt. *Barnes v. Bosley,* 828 F.2d 1253, 1259–60 (8th Cir. 1987); *Chi. Truck Drivers,* 207 F.3d at 506. The Individual Defendants took remedial action soon after the issues arose to substantially comply with the Court's scheduling order to ensure that the criminal defendants were produced and their hearings could go forward. And the Court continued with criminal proceedings on May 10 with the Marshals Service's coordination and cooperation and with the agreement of all parties involved. The hearings on May 11 similarly were conducted in a timely manner, in accordance with the Court's scheduling order.

The Individual Defendants are committed to discharging their official capacity duties in a manner that is the least disruptive to court operations. Along with the Marshals Service itself, Marshal Mosteller, Chief Deputy Marshal Houghtaling, and Mr. Kilgallon offer their sincerest regrets for the delays in communication that may have impacted the Court's operation. They have all committed to better communication with the Court and will continue to do so in an effort to facilitate dialogue on the issues the Court identifies in its Order to Show Cause. *See* Order, Exs. B, C, F. None of the purposes of civil contempt would be served by an order designed to coerce these officials into

compliance in these circumstances. *Chi. Truck Drivers*, 207 F.3d at 505. Particularly where any inability to comply with the Court's scheduling order was not self-induced but instead arose out of the Individual Defendants' good faith efforts to discharge their official duties pursuant to their employer's requirements. *Id.* Notably, the Court has issued a supplemental standing order that serves as prospective guidance to the Marshals Service and its individual employees on critical issues concerning the health, safety, and security of the federal court and those who work there. *See supra* at p. 12.[10]

*****

Defendants respectfully request the opportunity to present the testimony of Messrs. Mosteller, Houghtaling and Kilgallon at the forthcoming hearing on June 14, 2021, to explain the actions that took place on May 10. Counsel for the Defendants also anticipates the introduction of certain documents into evidence, as reflected in Attachment A. Although these witnesses also can discuss certain Marshals Service policies, Defendants respectfully note that the

---

[10] For the reasons already explained, Marshal Mosteller, Chief Deputy Marshal Houghtaling, and Mr. Kilgallon should not be personally held in contempt here. But should the Court rule otherwise, it then must, in determining the size and duration of any fine, "consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.'" *United States v. United Mine Workers of America,* 330 U.S. 258, 304 (1947). A party's good faith may also help to determine an appropriate sanction. *Taggart,* 139 S. Ct. at 1802. Here, the Individual Defendants' good faith and efforts at substantial compliance are factors counseling against a monetary fine, either in their official or individual capacities. There is no threat of continuing contumacy, particularly in light of the Court's supplemental standing order related to mask wearing and proper PPE in the Aberdeen federal courthouse.

27

deliberations underlying those policies would be subject to governmental and other privileges, including the deliberative process privilege.

In addition, Mr. Kilgallon respectfully requests the opportunity to present evidence and argument on the issue of personal jurisdiction if necessary to his defense. It is well established that a court without jurisdiction over the person of an alleged contemnor cannot punish him for the alleged violation of one of its rules or orders. *DeParcq v. United States District Court*, 235 F.2d 692 (8th Cir. 1956). We assume the Court may exercise jurisdiction over a non-resident federal official in his official capacity, and the defendants do not argue otherwise here. *See* 28 U.S.C. § 1391(e); *see also Stafford v. Briggs*, 444 U.S. 527, 542-43 (1980). Nor do they insist on service of the Court's order to show cause. *See* Order at 9. But Mr. Kilgallon is not a resident of this district, nor does it appear that jurisdiction extends to him in his personal capacity. *See Stafford*, 444 U.S. at 544-45 (holding that § 1391(e) does not authorize nationwide service of process in personal-capacity suits); *cf. Walden v. Fiore*, 571 U.S. 277, 290-91 (2014) (holding that a Georgia-based federal agent's contacts with Nevada were insufficient to support personal jurisdiction in a personal-capacity *Bivens* action).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court conclude that the Marshals Service and the Individual Defendants did not engage in contemptuous behavior.

Dated:  June 9, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General
Civil Division

JENNIFER D. RICKETTS
Director, Federal Programs Branch

CARLOTTA P. WELLS
CHRISTOPHER HALL
Assistant Branch Directors

*/s/ Joshua E. Gardner*
JOSHUA E. GARDNER
Special Counsel
United States Department of Justice
Federal Programs Branch
1100 L St. NW, Room 11502
Washington, DC 20530
Tel.:  (202) 305-7583
Fax:  (202) 616-8470
Email: joshua.e.gardner@usdoj.gov

*Counsel for Official Capacity Defendants*

C. SALVATORE D'ALESSIO, JR.
Acting Director, Constitutional Tort Staff
Torts Branch, Civil Division

RICHARD MONTAGUE
Senior Trial Counsel
Constitutional Tort Staff
Torts Branch, Civil Division

*/s/ Leah Brownlee Taylor*
LEAH BROWNLEE TAYLOR
United States Department of Justice
Senior Trial Attorney
Constitutional Tort Staff
Torts Branch, Civil Division
P.O. Box 7146
Washington, D.C. 20044
Leah.B.Taylor@usdoj.gov

*Counsel for Individual Capacity Defendants*

29

## CERTIFICATE OF COMPLAINCE WITH TYPE-VOLUME LIMITATION

The undersigned counsel hereby certifies that this brief complies with the word-count limitation in D.S.D. Civ. LR 7(B)(1) because the brief does not exceed 12,000 words. This certification is made in reliance on the word count of the Microsoft Word software used to prepare the brief, which indicates that the word-count volume is 7,535 words, including any headings and footnotes in the body of the brief.

*/s/ Joshua E. Gardner*